# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **IAN WRIGHT,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:23cv949 (SRU)** |
| | : | |
| **ANGEL QUIROS, et al.,** | : | |
| **Defendants.** | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Ian Wright, a *pro se* prisoner[1] in the custody of the Connecticut Department

of Correction ("DOC"), brings this action under 42 U.S.C. § 1983 complaining about his

exposure to COVID-19 during meals while he was housed at Osborn Correctional Institution

("Osborn"). Sec. Am. Compl., Doc. No. 12; Initial Review Order, Doc. No. 13. Wright claims

that DOC District Administrator Rodriguez, Osborn Warden Guadarrama and Food Service

Supervisor Wilcox (collectively, "Defendants") violated his rights under the Eighth Amendment

to the United States Constitution and behaved recklessly under Connecticut state law. *Id.* at 7,

10.

On February 3, 2025, Defendants filed a motion for summary judgment on all claims.

Defs.' Mot. for Summ. J., Doc. No. 53. On April 24, 2025, Wright filed his response to the

motion for summary judgment. Mem. of Law in Supp. of Opp. re First Mot. for Sum. J., Doc.

No. 68. On May 27, 2025, Defendants filed a Reply. Defs.' Reply to Pl.'s Opp. to Summ. J.,

Doc. No. 72. I granted Wright leave to file a supplemental memorandum of law or Sur-Reply in

---

[1] I may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161,
164 (2d Cir. 2012). The Connecticut D.O.C. website reflects that Wright was sentenced on March
22, 2002 to a term of incarceration that has not yet expired. *See* Inmate Information, Conn. State
Dep't of Correction, http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=286236 (last
accessed Sept. 19, 2025).

response to Defendants' Reply. Order, Doc. No. 74. Wright filed his Sur-Reply on July 15, 2025. Pl.'s Suppl. Mem. of Law, Doc. No. 75.

For the following reasons, the motion for summary judgment regarding Wright's claims against District Administrator Rodriguez, Warden Guadarrama, and Food Service Supervisor Wilcox is **granted**.

## I.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)1; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

Indeed, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary

2

judgment may be granted. *Anderson*, 477 U.S. at 249–50. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248; *see also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ("Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper.").

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

## II.    Factual Background[2]

---

[2] The following material facts are taken from the parties' Local Rule 56(a) Statements and the underlying evidentiary record. *See* Sec. Am. Compl., Doc. No. 12; Defs.' Rule 56(a)(1) Stmt., Doc. No. 53-2; Pl.'s Rule 56(a)(2) Stmt., Doc. No. 68-2. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Therefore, to the extent a party's Local Rule 56(a)2 Statement does not comply with Local Rule 56, I may consider a Local Rule 56(a)1 statement of fact to be admitted if supported by evidence. *See Wu v. Nat'l Geospatial Intel. Agency*, 2017 WL 923906, at *2 (D. Conn. Mar. 8, 2017) (noting in context of *pro se* plaintiff's failure to submit a Local Rule 56(a)2 statement, that "*pro se* parties are not excused from abiding by the Federal Rules of Civil Procedure.") (citation omitted). I note that Defendants provided Wright the Notice to *Pro Se* Litigant, which advised him of the Local Rule 56(a) requirements. Notice, Doc. No. 53-21.

After review of the statements of facts and the underlying record, I conclude that the following facts are not in dispute.[3]

## A.  The Parties

Wright is currently in the custody of the Connecticut Department of Correction ("DOC"). Defs.' R. 56(a)(1) Stmt., Doc. No. 53-2, at ¶ 1.  At all relevant times, he was a sentenced inmate. *Id.*  He was in the custody of the Osborn Correctional Institution ("Osborn") from April 8, 2021 to March 29, 2022.  *Id.* at ¶ 2.

During April 2021 through March 2022, Rodriguez served as District Administrator of District One (which includes Osborn); Guadarrama served as the Warden at Osborn; and Wilcox served as a Correctional Food Services Supervisor Three at Osborn.  *Id.* at ¶ 5.

District Administrator Rodriguez visited Osborn approximately one time per month.  *Id.* at ¶ 6.  Warden Guadarrama worked at Osborn five days per week, and he toured the facility once per week and the specialized units twice per week.  *Id.* at ¶ 8.  Wright admits that he saw Warden Guadarrama only one time, when he was standing outside of the Dining or "Chow Hall." *Id.* at ¶ 51.  Wright did not speak to Warden Guadarrama on that occasion.  *Id.*

As the Correctional Food Service Supervisor Three, Wilcox oversees the daily food service operations within the food service department at Osborn.  In this role, he supervises staff and inmates who prepare meals for the facility's inmate population, conducts inventories, and

---

[3] I cite only to the relevant paragraph in the Local Rule 56(a) Statement where a party's cited evidence establishes an undisputed fact.  The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

supervises the community staff who manage the various inmates working in the kitchen. *Id.* at ¶ 10. He routinely responds to inmate requests or inquiries related to their meals. *Id.* Wright admits that he never had direct contact with Wilcox and did not speak with Wilcox while in the Chow Hall. *Id*. at ¶ 44.

### B. Osborn's Response to COVID 19

The COVID-19 pandemic was an unprecedented public health emergency that posed significant challenges for correctional population management. *Id.* at ¶ 13. The novelty of the disease exacerbated these challenges, as medical advice on how to best treat COVID-19 was at times unclear prior to the introduction of the COVID-19 vaccine. *Id.* Protective measures in carceral facilities typically followed the orders of the DOC Commissioner, who adopted preventative policies based on any applicable CDC guidelines and the recommendations of medical professionals. *Id.*

District Administrator Rodriguez attests that, in March 2020, both DOC's Central Office—which included DOC's Chief Medical Officer—and Osborn's health services staff provided Osborn staff with instructions relating to the pandemic. Rodriguez Aff., Ex. C, Doc. No. 53-5, at ¶ 9. The COVID-19 protocols and measures subsequently implemented at Osborn relied on those recommendations. Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 31.

DOC developed a phase or level system based on the COVID-19 positivity rate in each facility; the COVID-19 operational response plan differed depending on the applicable phase or level. *Id.* at ¶ 15. All DOC staff consistently received guidance about the COVID-19 operational plan. *Id.* at ¶ 16. In addition, District Administrator Rodriguez maintained regular communication with the wardens of each correctional institution in District One. *Id.* at ¶ 17.

Warden Guadarrama asserts that he communicated relevant procedural changes to Osborn staff and, when necessary, instituted specific procedures at Osborn to effectuate agency-wide health protocols.  Guadarrama Aff., Defs.' Ex. A, Doc. No 53-3, at ¶ 18.[4]  To that end, Osborn inmates received guidance on how to keep themselves safe from COVID-19, such as through social distancing, frequent handwashing, and reporting any COVID-19 symptoms to appropriate Osborn staff.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 22; *see* Notice to Inmate Population, Defs.' Ex. E, Doc. No. 53-7 (regarding how to prevent spread of respiratory diseases like COVID-19).[5]  Osborn also provided its inmates with free bars of soap for handwashing and cleaning, and the facility cleaned and disinfected its common areas on a regular basis at a higher rate than before the pandemic.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 24. [6]

Osborn staff members were additionally required to undergo temperature checks before their shifts and to report any COVID-19 symptoms either prior to or during their work shift.  *Id.* at ¶ 27.[7]  Staff members had their temperatures rechecked during their shifts, and staff who

---

[4] Defendants maintain that Osborn instituted protocols for mask mandates, social distancing and hygiene in April 2020.  Defs.' Rule 56(a) Stmt., Doc. No. 53-2, at ¶ 21.  Wright asserts that COVID protocols were inadequate during 2020-2022.  Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 21; *see also* Pl.'s Aff., Doc. No. 68-1 at ¶¶ 6, 9-16, 57.

[5] Wright asserts that the instructions provided were inadequate.  *See* Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 22.

[6] Warden Guadarrama maintains that each unit was deep cleaned daily, showers were cleaned after each use, and walls sprayed down daily.  Guadarrama Decl., Defs.' Ex. A, Doc. No. 53-3, at ¶ 11.  But Wright insists that inmates were given a bar of soap the size of a credit card and common areas, phones, and showers were only cleaned once a day with diluted bleach or cleaning product.  *See* Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 24.  Wright also disagrees that prison officials provided Osborn inmates adequate cleaning supplies to disinfect their personal areas.  *Id.* at ¶¶ 25.

[7] Wright maintains that fever was not a reliable indicator of whether an individual was a carrier of COVID-19.  Pl.'s  R. 56(a) Stmt., Doc. No. 68-2, at ¶ 27.

demonstrated a high temperature or reported symptoms had to leave the facility. *Id.* at ¶ 28. If a staff member reported symptoms of COVID-19 or reported a positive COVID-19 test result, that staff member was required to consult with facility staff so that staff could assess possible points of exposure, notify others of possible exposure, and conduct any necessary decontamination. *Id.* at ¶ 29.

In May 2020, DOC began housing inmates based on their COVID-19 testing status; inmates who tested positive for COVID-19 or who displayed COVID-19 symptoms were quarantined. *Id.* at ¶ 30.[8]

**Osborn Dining Hall ("Chow Hall")**

Defendants maintain that there was a policy for social distancing in the Osborn Chow Hall in 2021 and 2022; in particular, they note that staff marked each table for social distancing and marked four-person tables as for only two people. *See* Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 32. Defendants assert that signs in the hall instructed inmates to sit "2 inmates per table, sit on painted seats Only." *See id.* at ¶¶ 33-34. Warden Guadarrama and Wilcox attest to having observed seats in the Chow Hall marked for social distancing. Guadarrama Aff., Defs.' Ex. A, Doc. No. 53-3, at ¶ 31; Wilcox Aff., Defs.' Ex. B, Doc. No. 53-4, at ¶ 12. Defendants represent that custody staff received a memorandum on December 8, 2021 advising that "[f]or the purpose of Social Distancing, inmates are to sit only in the seats that are painted white." *See* Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 33.

---

[8] Wright maintains that that the measures taken did not effectively minimize the risk of the COVID-19 spreading through staff, inmates transferring in and out of the facility, and inmates who were asymptomatic or pre-symptomatic. Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 30. *See* Pl.'s Aff., Doc. No. 68-1, at ¶¶ 9-13.

Wright counters that four inmates at a time were forced to sit at each table during meals, and that there were no signs directing inmates to sit two to a four-person table. *See* Pl.'s Aff., Doc. No. 68-1, at ¶¶ 18-19, 23-24, 31-32. Wright admits that some of the Osborn Chow Hall seats were painted white, but he asserts that the white paint was not effective without any signage or implementation of a social distancing policy. *See* Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶¶ 35-36; Pl.'s Aff., Doc. No. 68-1 at ¶ 30.

Prison surveillance videos of the Osborn Chow Hall on November 10, 2021 show prisoners frequently eating at tables in close proximity to each other, with prisoners seated four-to-a-table.[9] *See generally* Surveillance Videos, Pl.'s Ex. 11, Doc. No. 66.[10]

In contrast, social distancing was clearly in place during lunchtime at the dining tables in the clothing factory, where Wright worked. Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 38. Cubicles set up with industrial plastic dividers separated inmates, and only two inmates could eat at a table at a time. *Id.*

---

[9] The CDC described "[s]ocial distancing" as "the practice of increasing the space between individuals and decreasing their frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic)." Center for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Dec. 31, 2020), https://stacks.cdc.gov/view/cdc/100951. In the same document, it recommended social distancing on "an operational level (e.g., rearranging chairs in the dining hall to increase distance between them)." *Id.* It noted: "Social distancing can be challenging to practice in correctional and detention environments … [but] is vital for the prevention of respiratory diseases such as COVID-19, especially because people who have been infected with SARS-CoV-2 but do not have symptoms can still spread the infection." *Id.*

[10] Where the parties present conflicting versions of an incident and video evidence of the incident has been submitted on a motion for summary judgment, the court must view the facts "in the light depicted" by the video of the incident. *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007).

The Plant Facility Engineering, the General Maintenance Supervisor and the General Maintenance Officers in the facility monitored ventilation in the DOC Chow Halls. *Id.* at ¶ 52. The Chow Hall windows could open to the outside.[11] *Id.* Warden Guadarrama observed that the windows would be opened when weather permitted to increase the air flow. *Id.*

### C. Wright's Hunger Strike

Wright claims that he was on hunger strike from October 14, 2021 to November 30, 2021. Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 63. He admits, however, that he did not abstain from food or fluids during his hunger strike and consumed commissary items instead of going to the Chow Hall from October 15 to December 3, 2021. *Id.* at ¶¶ 65-66, 68.

After he sent inmate requests about his hunger strike, which he blamed on the "unsafe and unsanitary" conditions in the Chow Hall, the medical unit called in Wright for an evaluation on October 17, 2021. Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 69; Inmate Request Forms, Pl.'s Ex. 4, Doc. No. 67, at 17-19.[12] Wright returned to the Chow Hall in December 2021, when he started feeling lethargic. Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 69; Pl.'s Aff., Doc. No. 68-1, at ¶ 32.

### D. COVID-19 Diagnosis

Wright had the opportunity to receive the COVID-19 vaccine in March 2021. Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 72; *see* Pl.'s Dep., Defs.' Ex. R, Doc. No. 53-20, at 11:5-7. A

---

[11] Wright maintains that the Osborn ventilation in the dining hall was poor, since the fans were located in an area that blew dust and particles all over the hall, and the windows were shut during winter months. Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 52.

[12] Wright admitted to a nurse that he was consuming commissary food and explained that he was avoiding food served at the Chow Hall because it was "unsafe." Medical Records, Pl.'s Ex. 16, Doc. No. 61, at 14.

medical record dated March 19, 2021 shows an entry indicating that he decided not to receive the vaccine on that date.  Medical Record, Defs.' Ex. D, Doc. No. 55, at 5 (under seal).

On December 6, 2021, Wright tested positive for the COVID-19 virus, leading to his quarantine.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 73.  Following a mandatory fourteen-day stay in the quarantine unit, Wright returned to his housing unit.  *Id.*  The medical record reflects that Wright saw medical staff regarding his COVID-19 condition on each day between December 6 through December 20, 2021.  Medical Record, Defs.' Ex. D, Doc. No. 55, at 12-34.  According to the medical note for December 6, 2021, Wright denied symptoms of nausea, vomiting, diarrhea, shortness of breath, dizziness or loss of smell and was instructed to rest, increase his hydration, and practice good hand hygiene.  *Id.* at 12.  The medical record also reflects that he refused COVID screening questions and a vitals assessment on December 7, 10, 11, 17, and 19, and denied having any symptoms from COVID-19 on December 8, 14, 15, and 18.  *Id.* at 13, 14, 18-19, 25, 28, 30, 31, 32, 33.

On the morning of December 8, 2021, Wright reported to medical staff that he was having shortness of breath.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 75; Medical Record, Defs.' Ex. D, Doc. No. 55, at 15.  A medical record for an afternoon assessment on December 8, 2021 reported that Wright denied having COVID symptoms.  *Id.* at 14.  On the evening of December 9, 2021, he was assessed as asymptomatic.  *Id.* at 17.  A medical note for December 12, 2021 indicates that Wright reported no cough or shortness of breath and stated he was "allright."  *Id.* at 20.  On December 13, 2021, Wright reported chest pain and coughing to DOC medical staff

during his evaluation.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 76; Medical Record, Defs.' Ex.

D, Doc. No. 55, at 21-23.[13]

In his deposition, Wright testified that he developed chest pain after being exposed to

radon at Garner Correctional Institution, that the chest pains "flared up" while he was in the

quarantine unit, and the chest pains "persist[] to this day."  Pl.'s Dep., Defs.' Ex. R, Doc. No. 53-

20, at 36:15-19.  He stated that although he experienced joint pain while in the quarantine unit

and afterwards, he did not report his symptoms to any medical professional during his quarantine

or after his return to the general population.  *Id.* at 34:17-35:25.  He explained:  "The joint pain

only lasts, like I said, 10 to 20 minutes.  Like, what are you going to really report?  It's not like

something that you could really demonstrate to them as they always want you to do in

medical[.]"  *Id.* at 35:21-25.  Wright claimed further that he had not been diagnosed with long

COVID as he had not had "sufficient follow up care to even come to that point of diagnosis[.]"

Pl.'s Dep., Pl.'s Ex. 20, Doc. No. 69, at 301:19-22.[14]  Wright describes experiencing anxiety

"from time to time" about COVID-19.  *Id.* at 303:12-14; 304:18-21; 305:8-11; 306:3-5.[15]  He

admits that he did not report his emotional distress to healthcare providers due to his concerns

---

[13] Wright denied Defendants' assertion that this was the first time since his admission to quarantine that he reported this symptom and that he refused to shave his chest for an accurate EKG.  *See* Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 76; Medical Records, Defs.' Ex. D (under seal), Doc. No. 53-6, at 21.  He maintains that this was not his first report of chest pain and that he received an EKG on December 13, 2021.  Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 76.

[14] Defendants cite to page 122 of their exhibit R (Wright's deposition), but this page is not included in exhibit R.

[15] Again, Defendants cite to deposition pages that are not included in exhibit R.  These pages are, however, included in Wright's Exhibit 20.  *See* Pl.'s Ex. 20, Doc. No. 67.

that he would not receive adequate treatment and that his mental health score would be raised. Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 82.

### E. Administrative Remedies Regarding Food and Dining Hall Conditions

On September 3, 2021, Food Supervisor Wilcox received Wright's inmate request form in which he voiced concern with correctional staff's decision to order inmates to sit four people to a table in the Chow Hall during meal times. Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 39. He requested trays or a policy that inmates sit two to a table. *Id.*; *see* Inmate Request, Defs.' Ex. K, Doc. No. 53-13. In his response, Wilcox stated: "I have no control over this." Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 41.

On September 11, 2021, Wright filed a Level 1 grievance concerning the "dangerous conditions" during meals in the Chow Hall, which he noted had no social distancing with inmates sitting four people to a table during meals. *Id.* at ¶ 48; Inmate Grievance Form – Level 1 9/11/21, Defs.' Ex. L, Doc. No. 53-14. Wright claimed that such conditions exposed him to the risk of being infected with COVID-19. *Id.* Warden Guadarrama denied the Level 1 grievance. Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 48. He wrote:

> We are currently operating under the guidance of Central Office and the Public Health Department. Will continue to operate under the current Operational Plan until we are directed otherwise by Central Office. Therefore, your grievance is denied.

*Id.*

After his review of Wright's Level 1 Grievance, Warden Guadarrama met with Food Supervisor Wilcox and Regional Supervisor Oliver to confirm the social distancing protocols in the Chow Hall. *Id.* at ¶ 49; *See* Guadarrama Aff., Defs.' Ex. A, Doc. No. 53-3, at ¶ 29.

On September 15, 2021, Wright filed a Level 2 appeal of Warden Guadarrama's grievance denial.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 54; Inmate Grievance Appeal Form Level 2 – 9/15/21, Defs.' Ex. M, Doc. No. 53-15.

On October 21, 2021, District Administrator Rodriguez denied Wright's grievance appeal.  Defs.' R.56(a) Stmt., Doc. No. 53-2, at ¶ 55.  District Administrator Rodriguez wrote:

> You are appealing a level 1 grievance (115-22-052) regarding COVID prevention measures at Osborn C.I.  The DOC holds varying phases of securing in place to combat the spread of COVID-19, we test regularly and closely monitor cases within our facilities.  These phases are dictated by the number of positive cases within the unit and a notable increase would require us to reinstate restrictions appropriately.  However, with the absence of these circumstances we must attempt more mobility to promote the overall wellbeing of our population.  Your level 2 grievance is denied.

*Id.*  District Administrator Rodriguez was aware of the COVID-19 positivity rate at Osborn from 2021-2022.  *Id.* at ¶ 56.  Wright admits that he has never seen or conversed with District Administrator Rodriguez at Osborn.  *Id.* at ¶ 58.

### F.  Administrative Remedies About Hunger Strike

On October 15, 2021, Wright sent a letter to Commissioner Quiros regarding his concerns about social distancing during meals.  *Id*. at ¶ 59; Letter to Comm'r Quiros & Resp. 10/26/21, Defs.' Ex. N, Doc. No. 53-16.  Wright's letter was forwarded to Warden Guadarrama, who issued a response on October 26, 2021, in which he stated:  "the seating in the dining halls are marked to comply with social distancing."  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 59; Letter to Comm'r Quiros & Resp. 10/26/21, Defs.' Ex. N, Doc. No. 53-16.

From October 14-16, 2021, Food Service Supervisor Wilcox received four inmate requests forms from Wright; each inmate request stated that Wright was on "hunger strike" because the food being served was "unsafe and unsanitary."  Defs.' R. 56(a) Stmt., Doc. No. 53-

2, at ¶ 60; Inmate Request Form – 10/14/21, Defs.' Ex. O, Doc. No. 53-17, at 1-8.  None of these

requests referred to COVID-19 or social distancing concerns in the Chow Hall.  *Id.*  In his

responses to the inmate requests, Wilcox addressed the efforts to clean and sanitize the kitchen.

Defs.' Ex. O, Doc. No. 53-17, at 1-8; Wilcox Aff., Defs.' Ex. B, Doc. No. 53-4, at ¶ 19.  Wilcox

maintains that he received no other information about Wright's meal refusal.  Defs.' Ex. B, Doc.

No. 53-4, at ¶ 19.

On October 26, 2021, Wright filed his Level-1 Grievance #115-22-102, stating he was on

a "hunger strike" due to a pest infestation.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 61; Inmate

Grievance Form – Level 1 10/26/21, Defs.' Ex. P, Doc. No. 53-18.  His grievance did not refer to

COVID-19 or social distancing concerns.  Defs.' Ex. P, Doc. No. 53-18.  Warden Guadarrama

received Wright's Level-1 Grievance on November 1, 2021.  *Id.*  Warden Gaudarrama

believed—based on his review of documents—that Wright was on a "hunger strike" due to

concern about a pest infestation in the kitchen.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 61.

Warden Guadarrama denied Wright's Level-1 Grievance #115-22-102.  Defs.' Ex. P,

Doc. No. 53-18.  Wright filed a Level-2 Appeal, which Acting District Administrator

McClendon denied on December 23, 2021.  Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶ 62; Inmate

Grievance Appeal Form Level 2 – 11/17/21, Defs.' Ex. Q, Doc. No. 53-19.

## III.    Discussion

Defendants argue Wright cannot establish the requisite elements of his Eighth

Amendment claims and, alternatively, that qualified immunity shields them from any liability.[16]

Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J., Doc. No. 53-1.

---

[16] Defendants have asserted qualified immunity as their first affirmative defense.  Defs.' Answer &
Aff. Defenses to Am. Compl., Doc. No. 36.

A.    **Eighth Amendment**

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." U.S. Const. Amend. 8. Prison conditions can constitute cruel and unusual punishment in violation of the Eighth Amendment if prison officials act, or fail to act, with "deliberate indifference to a substantial risk of serious harm to a prisoner." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). To state a claim of deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, Wright must allege that he was incarcerated under conditions that either resulted in a "sufficiently serious" deprivation of a life necessity or basic human need or that posed "a substantial risk of serious harm" to his health or safety. *Farmer*, 511 U.S. at 834.

The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes,* 452 U.S. at 348. Conditions are considered in combination when they have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at 304.

To meet the subjective element, an inmate must show that the defendants possessed culpable intent; that is, the defendants knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. Therefore, the defendants "must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and [the defendants] must also draw the inference." *Id.* at 837. "[M]ere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires a plaintiff to provide evidence that a defendant knew of and disregarded a serious risk of harm to his health and wellbeing. *Tangreti v. Bachman*, 983 F.3d 609, 619 (2d Cir. 2020).

### B.   Qualified Immunity

"The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). A right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although the defendant need not point to a decided case with the same exact facts as the one at issue to claim qualified immunity, there must still be "existing precedent" that has placed "the statutory or constitutional question beyond debate." *Id*. For our purposes, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cty., New York*, 17 F.4th 342, 367 (2d Cir. 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)).

Even if a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right. *Manganiello v. City of New York,*

612 F.3d 149, 165 (2d Cir. 2010). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) ("[I]f the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate."). But an officer's conduct is objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances. *Lennon*, 66 F.3d at 420-21.

"The objective reasonableness of an official's conduct is a mixed question of law and fact." *Nazario v. Thibeault*, 2022 WL 2358504, at *8 (D. Conn. June 30, 2022) (quoting *Taravella v. Town of Wolcott,* 599 F.3d 129, 133 (2d Cir. 2010)) (internal quotation marks and alterations omitted). Therefore, "[a]lthough qualified immunity is a question of law, because [the] issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." *Maye v. Vargas*, 638 F. Supp. 2d 256, 262 (D. Conn. 2009).

### 1. **Wright's Eighth Amendment Claim**

For his Eighth Amendment claims to proceed, there must be evidence showing that— when read in a light most favorable to Wright, as the nonmoving party—both the objective and subjective elements can be satisfied regarding each defendant.

On initial review, I assumed that the presence of contagious respiratory illnesses such as COVID-19—and the increased likelihood of contracting them under the conditions present at Osborn Chow Hall—presented a substantial risk of serious harm to Wright's health. IRO, Doc. No. 13, at 6.

With regards to the subjective element, I previously observed that Wright's alleged facts suggested that Warden Guadarrama, District Administrator Rodriguez, and Food Service Supervisor Wilcox understood that Wright feared COVID-19 exposure during meals in the Chow Hall. *Id.* at 7. I also noted that Warden Guadarrama and Food Service Supervisor Wilcox denied his request to have a tray for meals in his housing unit. *Id.*

I now turn to consider whether the present evidentiary record shows that Wright cannot prevail, as a matter of law, on his claims against the three Defendants.

### a.  Objective Element

"[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996). "It is ... undisputed—and, indeed, by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 440 (D. Conn. 2020). "Courts have found that inmates may face a substantial risk of serious harm absent adequate measures to counter the spread of COVID-19." *Booker v. Sefman*, 2024 WL 3521779, at *3 (S.D.N.Y. July 23, 2024); s*ee also Gibson v. Rodriguez*, 2021 WL 4690701, at *5 (D. Conn. Oct. 7, 2021) ("The court makes that determination in light of the steps the facility has already taken to mitigate the danger.") (internal citations and quotations omitted). By contrast, a plaintiff's general allegations of an increased risk from COVID-19—"without specific

instances of increased exposure, positive tests, or evidence of an underlying medical condition"—is not enough to support an inference of a substantial risk of harm." *Booker*, 2024 WL 3521779, at *4.

In the instant case, Defendants submitted evidence that measures existed to mitigate the spread of COVID-19 within Osborn, such as the marking of seats in the Chow Hall and signage directing inmates to sit "2 [] per table." Defs.' R. 56(a) Stmt., Doc. No. 53-2, at ¶¶ 32-38. These social distancing policies largely failed to be enforced, however, with surveillance footage showing numerous prisoners in the Chow Hall in close proximity to one another, seated four-to-a-table. Surveillance Videos, Pl.'s Ex. 11.[17] Considering the ways COVID-19 may be spread—through contact, respiratory droplets, and aerosols—it is not surprising that Wright tested positive for COVID-19 shortly after he sat at a table with an inmate who was sneezing and coughing uncontrollably, and that he tested positive along with several other inmates on December 6, 2021. *Id.* at ¶¶ 32-33.

A substantial risk of serious harm therefore existed vis-à-vis the high risk of contracting COVID-19 within the Chow Hall. *See Pierce v. Rodriguez*, 2023 WL 2646825, at *8-9 (D. Conn. Mar. 27, 2023) (concluding that there was a dispute of material fact on the objective prong because the plaintiff represented that inmate workers who moved through the prison were not being separated from nonworkers and infected inmates were not being moved out of the cell block). Even so, there is no evidence that the correctional officers named as defendants in this case took any affirmative steps to create or worsen Wright's risk of contracting COVID-19. Wright admits that neither Food Supervisor Wilcox nor Warden Guadarrama personally forced

---

[17] *See generally*, Surveillance Videos, Pl.'s Ex. 11.

him to sit at a table in the Chow Hall.  Pl.'s Aff., Doc. No. 68-1, at ¶ 43, 50.  Wright has additionally provided no evidence that Wilcox, Guadarrama, or Rodriguez were directly responsible for enforcing social distancing policies in the Chow Hall, with the latter two in supervisory positions that separated them from day-to-day enforcement.

Therefore, even if Wright faced a substantial risk of serious harm in the Chow Hall during the COVID-19 pandemic, there is no genuine issue of fact here because Rodriguez, Guadarrama, and Wilcox did not personally create or adopt policies that engendered this harm. Instead, as described below in the subjective analysis, the three correctional officers in this case either believed they took reasonable steps to mitigate the spread of COVID-19 or were not the officials directly in charge of enforcing social distancing policies in the Chow Hall.  The objective prong cannot be met under these circumstances.

### b. Subjective Element

To hold any defendant liable for deliberate indifference under the Eighth Amendment, Wright must prove that a defendant had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it.  *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020). The Second Circuit declared that a plaintiff cannot rely on a special test for supervisory liability. *Id*. at 620; *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").  Nonetheless, "*Tangreti* did not immunize government officials who serve in supervisory roles from Section 1983 liability."  *Reynolds v. Arnone*, 2025 WL 974843, at *11 (D. Conn. Mar. 31, 2025).  Indeed, supervisory officials may still be held liable for damages for "certain forms of supervisory conduct, such as the creation or implementation of policies" or "for

their own conduct with respect to creating, adopting, or enforcing an unconstitutional policy." *Id.*

### 1.      District Administrator Rodriguez

District Administrator Rodriguez denied Wright's appeal of Warden Guadarrama's Leve1 1 grievance denial. *See* Inmate Grievance Appeal Form, Defs.' Ex. M, Doc. No. 53-15. In his appeal, Wright claimed "great risk" from eating in the Osborn Chow Hall with inmates "seated (4) person per table with no social distancing[.]" *Id.* District Administrator Rodriguez denied the appeal on the stated grounds that "DOC holds varying phases of security in place to combat the spread of COVID-19 … dictated by the number of positive cases within the unit and a notable increase would require us to reinstate restrictions appropriately." He explained that "with the absence of these circumstances we must attempt more mobility to promote the overall wellbeing of our population." *Id.*

The only evidence of District Administrator Rodriguez's involvement with Wright's complaint is his denial of Wright's Level-2 Grievance Appeal. *See* Rodriguez Aff., Defs.' Ex. C, Doc. No. 53-5. That alone is not enough to support an inference that he acted with deliberate indifference. *See Muniz v. Cook*, 2021 WL 5919818, at *6 (D. Conn. Dec. 15, 2021 (noting district courts have held that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement of a supervisor in the denial of a constitutional right); *Cummings v. Paterson*, 2021 WL 2550821, at *11 (W.D.N.Y. June 22, 2021) (defendants' review of denials of administrative remedies did not establish their personal involvement); *Smart v. Annucci*, 2021 WL 260105 at *5 (S.D.N.Y. Jan. 26, 2021) (denying administrative appeal insufficient to establish personal involvement).

Even if District Administrator Rodriguez could be held liable for denying Wright's grievance appeal, he is entitled to qualified immunity because it is not clearly established that a supervisory prison official can be held liable for an Eighth Amendment violation due to that official's denial of an administrative appeal alone.  In *Terbesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014), the Second Circuit held that a district court must look to Supreme Court and Court of Appeals precedent to conclude whether a right is clearly established.  I was unable to find any precedent within this Circuit or from the Supreme Court suggesting that a denial of an administrative appeal, standing alone, gives rise to an Eighth Amendment claim.  *Cf. Abascal v. Fleckenstein*, 2008 WL 3286353 at *9 (W.D.N.Y. Aug. 7, 2008) (dismissing deliberate indifference claim that rested exclusively on supervisory prison official's rejection of an administrative appeal).

Therefore, I grant the motion for summary judgment in favor of District Administrator Rodriguez.

### 2.    Warden Guadarrama

Warden Guadarrama served as warden during the challenging COVID-19 pandemic and worked to implement measures to limit the disease's spread based on recommendations promulgated by the CDC and other medical professionals.  *See* Guadarrama Aff., Defs.' Ex. A, Doc. No. 53-3, at ¶¶ 8-23.  Warden Guadarrama explained that DOC developed a phase or level system based on the COVID-19 positivity rate in each facility, and therefore, the COVID-19 operational response differed depending on the phase or level.  *Id.* at ¶ 24.  He stated that due to an increased COVID-19 positivity rate, Osborn moved to its phase 2 COVID-19 operational response plan on December 10, 2021.  *Id.* at ¶ 26.

On September 13, 2021, Warden Guadarrama denied Wright's Level 1 Grievance seeking redress for his risk of exposure to COVID-19.  Grievance, Defs.' Ex. L, Doc. No. 53-14. According to his declaration, Warden Guadarrama later met with Food Service Supervisor Wilcox and the Regional Supervisor to confirm the social distancing protocol that limited tables to two people each in the Chow Hall.  Guadarrama Aff., Defs.' Ex. A, Doc. No. 53-3, at ¶¶ 29-30.  He attests to observing the Chow Hall seats marked for social distancing.  *Id.* at ¶ 31.  He explains that his response to a letter from Wright about inadequate social distancing at meals "specifically indicated that 'the seating in the dining halls [were] marked to comply with social distancing.'"  *Id.* at ¶ 33.

Warden Guadarrama's confirmation of the existence of a social distancing protocol and implementation plan for the Chow Hall suggests he recognized the importance of social distancing to prevent the spread of COVID-19 during meals.  Although Guadarrama could have theoretically done more to assess whether further action was necessary to enforce social distancing during meals—such as reviewing surveillance video or continuing to monitor the Chow Hall—there is limited evidence that Guadarrama was personally involved in enforcing social distancing policies in the Chow Hall.  Instead, at least one degree of separation existed between Guadarrama's responsibilities as warden and those of the prison officials directly involved in the Chow Hall's daily operations.  *Id.* at ¶ 9.

The only evidence asserted against Guadarrama is that he denied Wright's grievance and at one point saw social distancing policies being violated through a window overlooking the Chow Hall.  Pl.'s Mem. of Law in Supp. of Opp'n re First Mot. for Summ. J., Doc. No. 68, at 29, 33.  But just as in District Administrator Rodriguez's case, a supervisory official's denial of a

grievance is not enough to establish an Eighth Amendment violation. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (questioning "whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of"). Similarly, the fact that Guadarrama may have once witnessed social distancing policies being violated in the Chow Hall does not mean that Guadarrama himself created the circumstances that Wright complains about. This is not a case in which the official directly participated in the violation, *see Goodall v. New York State Dep't of Corr. & Cmty. Supervision*, 725 F. Supp. 3d 248, 270 (N.D.N.Y. 2024), or even one in which the official must have known that a substantial risk of serious harm existed. *See Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020).

Given the lack of evidence showing Guadarrama's personal involvement in the daily operations of the Chow Hall's seating area, a reasonable jury could not find that Guadarrama acted with a culpable mind. Guadarrama appeared to understand the risk faced by incarcerated individuals during the COVID-19 pandemic: he helped establish a COVID-19 response plan for Osborn and met with Food Supervisor Wilcox and the Regional Administrator to ensure that the Chow Hall adopted social distancing protocols. He also never forced Wright to eat in the Chow Hall. Therefore, I cannot conclude as a matter of law that Warden Guadarrama violated the Eighth Amendment.

I also conclude that Warden Guadarrama is entitled to qualified immunity.[18] The qualified immunity analysis turns on a similar factual issue; *i.e.*, whether Warden Guadarrama

---

[18] Wright's right to be protected from infectious disease was clearly established in the Second Circuit before 2020. *Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981) (holding that a prison's failure to screen new inmates for infectious diseases violated the Eighth Amendment); *Jolly v. Coughlin*, 76 F.3d 468, 477 (holding that "correctional officials have an affirmative obligation to protect inmates from infectious disease," including, in that case, tuberculosis).

ignored an obvious risk of COVID-19 infection in the face of poorly enforced social distancing rules in the Chow Hall. Because there is no genuine factual dispute here, I determine, as a matter of law, that it was objectively reasonable for Guadarrama to believe that he took adequate steps to mitigate the risk of harm faced by Wright in the Chow Hall.

I must therefore grant Defendants' motion for summary judgment regarding Warden Guadarrama.

### 3.    Food Service Supervisor Wilcox

The record demonstrates that Wilcox was aware of the social distancing protocol and the plan to limit seating to 2 inmates a table. Wilcox Aff., Defs.' Ex. B, Doc. No. 53-6, at ¶¶ 10-12. But the record supports no inference that Wilcox could have afforded relief responsive to Wright's complaint about the lack of social distancing in the Chow Hall or his need for a tray. *See* Inmate Request Form – 9/3/21, Defs.' Ex. K, Doc. No. 53-13. I discern no evidence that Wilcox had the authority to direct custody staff to enforce social distancing protocol in the Osborn Chow Hall[19] or to provide for Wright to receive a tray.[20]

---

[19] Wright disputes that Wilcox had no authority over the correctional seating inmates in the Osborn Chow Hall. Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 41. Wright cites to his own affidavit, Doc. No. 68-1 at ¶ 23, Wilcox's interrogatory response that he "oversee[s] daily operations within the food service department," Doc. No. 69 at 74, and a Post Order, Doc. No. 67 at 80. But this evidence fails to support an inference that Wilcox had any authority over the custody staff seating inmates in the Osborn Chow Hall.

[20] Wilcox attests that he could not change the DOC COVID-19 operational response plan. Wilcox Decl., Defs.' Ex. B, Doc. No. 53-4, at ¶ 8. He explains that distribution of trays depended on the operational response phase, and he therefore, had no authority to decide who received a tray. *Id.* Wright claims that Wilcox had the ability as a Food Service Supervisor to provide him a tray but cites to no authority providing that a Food Supervisor could make tray determinations at the time of his grievance in September 2021. *See* Pl.'s R. 56(a) Stmt., Doc. No. 68-2, at ¶ 46.

Because of his lack of authority, no reasonable jury could find that Wilcox acted with a "culpable state of mind" in violation of the Eighth Amendment. *See Tucker v. Chapdelaine*, 2024 WL 896751, at *7 (D. Conn. Mar. 1, 2024) ("A reasonable jury could not find that defendant Genego acted with deliberate indifference by failing to prescribe the plaintiff pain medication when she had no authority to do so."); *see Rogers v. Lamont*, 2022 WL 16855969 at *4 (D. Conn. Nov. 10, 2022) (dismissing deliberate indifference claim against a correctional officer who was not alleged to have any authority to alter challenged prison facility dining room social distancing protocols); *Kregler v. City of New York*, 821 F. Supp. 2d 651, 658-59 (S.D.N.Y. 2011) (dismissing deliberate indifference claims against defendants who "lacked the authority to prevent the alleged constitutional violation caused by their supervisor").

Alternatively, to the extent that his failure to provide Wright with a tray or to enforce the Osborn Chow Hall social distancing protocol constituted an Eighth Amendment violation, Wilcox is entitled to qualified immunity. It was objectively reasonable for him to believe that his conduct under the circumstances did not violate the Eighth Amendment.

Accordingly, I grant the motion for summary judgment in Food Supervisor Wilcox favor on Wright's Eighth Amendment claim.

### B.    State Law Recklessness

Wright asserts claims of recklessness arising from the alleged deliberate indifference shown by Guadarrama, Rodriguez, and Wilcox.

A district court has discretion to retain or decline supplemental jurisdiction over a state law claim asserted against a defendant who has no federal claims pending against him. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (noting that the

court can exercise supplemental jurisdiction over a state law claim even if "asserted against a party different from the one named in the federal claim" but "[t]he fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so. Instead, it may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c).");
*Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 160–61 n.6 (S.D.N.Y. 2021) (declining to exercise jurisdiction over state law claims against certain defendants against whom no federal claims were pending; discussing discretion to do so; and collecting cases).

I have granted the motion for summary judgment on Wright's Eighth Amendment claims against District Administrator Rodriguez, Warden Guadarrama, and Food Service Supervisor Wilcox.

Accordingly, I decline to exercise supplemental jurisdiction over the state law claims for recklessness against District Administrator Rodriguez, Warden Guadarrama, and Food Service Supervisor Wilcox pursuant to 28 U.S.C. § 1367(c).  *Jean-Baptiste v. Froehlich*, 2024 WL 4581653, at *7 (D. Conn. Oct. 25, 2024) (declining supplemental jurisdiction over state claims against defendants after granting summary judgment on all federal claims against those defendants, but retaining supplemental jurisdiction over state law claim against remaining defendant with pending federal claim).

## IV.    Conclusion

For the foregoing reasons, the motion for summary judgment, Doc. No. 53, is **GRANTED** on the Eighth Amendment claims against Warden Guadarrama, District Administrator Rodriguez, and Food Service Supervisor Wilcox.  I decline supplemental jurisdiction over the state law claims of reckless against Warden Guadarrama, District

Administrator Rodriguez and Food Service Supervisor Wilcox.

SO ORDERED at Bridgeport, Connecticut this 30th day of September, 2025.

_____
Stefan R. Underhill
United States District Judge